UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON


CIVIL ACTION NO. 2008-236 (WOB)


BRENDA S. ANDRESS, ET AL                           PLAINTIFFS

VS.                    MEMORANDUM OPINION AND ORDER

GANNETT SATELLITE
INFORMATION NETWORK,
INC. d/b/a The
Cincinnati Enquirer                                DEFENDANT


      This matter is before the court on the defendant's motion
for summary judgment (Doc. 39).

      The court heard oral argument on this motion on Wednesday,
September 29, 2010.  Kim Vocke represented the plaintiffs, and
Alycia Ziarno and Kevin Murphy represented the defendant.
Official court reporter Joan Averdick recorded the proceedings.

      Having heard the parties, the court now issues the following
Memorandum Opinion and Order.

                  *Factual and Procedural Background*

      This is a diversity action in which plaintiffs, former
independent distributors of *The Kentucky Post*, allege tort claims
against the paper's former publisher.

      Defendant Gannett Satellite Information Network, Inc.
("Gannett") is, among other things, a newspaper publisher.
Gannett (by its predecessor) and E.W. Scripps Company were
parties to a newspaper Joint Operating Agreement ("JOA") made

pursuant to the Newspaper Preservation Act, 15 U.S.C. § 1801 et seq.  The JOA was executed in 1977 and had an expiration date of December 31, 2007, with an option for renewal.  Under the JOA, Gannett was responsible for all the business operations for the publication of Gannett's *Cincinnati Enquirer* and Scripps's *Cincinnati Post* and *Kentucky Post*, with the exception that the *Post* papers were to maintain a separate editorial board.

Plaintiffs are six individuals who contracted with Gannett to purchase copies of *The Post* for resale to the general public in Northern Kentucky via home delivery, retail sales, and newspaper rack sales.  In some cases, plaintiffs purchased delivery routes from third parties in order to sell the newspapers.  Plaintiffs, as independent contractors, were free to set the price for the papers they resold after buying them from Gannett.

In 2004, Gannett announced that it would not renew the JOA when it expired on December 31, 2007.  In July 2007, Scripps announced that it would no longer publish the *Post* after the JOA terminated.

When the *Post* ceased publishing in December 2007, Gannett offered to purchase plaintiffs' route customer lists.  The six plaintiffs herein declined Gannett's offer.

Plaintiffs filed suit against Gannett on October 27, 2008, in Kenton County Circuit Court.  Plaintiffs' original complaint

listed five causes of action: (1) Interference with Business
Relationships; (2) Interference with Plaintiffs' Performance of
Their Contracts; (3) Interference with Prospective Contractual
Relations; (4) Intentional Infliction of Emotional Distress; and
(5) Violation of the Kentucky Consumer Protection Act ("KCPA"),
KRS 367.170.

Defendant timely removed the case to this court based upon
diversity jurisdiction. On January 6, 2009, defendant filed a
motion to dismiss. After a hearing, the court dismissed the KCPA
claim but denied the motion as to the other claims. However, the
court stated in its order:

> As to plaintiffs' other claims, the court concludes that,
> while the complaint is not awash in detail, it does allege
> sufficient factual support such that discovery is warranted.
> **After such discovery, plaintiffs will be required to amend
> their complaint to state with particularity the factual
> support for their claims, subject to scrutiny by the court
> under Rule 11. The court expects that if discovery reveals
> an inadequate basis for any cause of action, that claim will
> not be included in the amended complaint.**

(Doc. 11) (emphasis added).

On February 4, 2010, plaintiffs filed an Amended Complaint,
which alleges only three claims: (1) Interference with Business
Relationships; (2)Interference with Plaintiffs' Performance of
Their Contracts; and (3) Interference with Prospective
Contractual Relations. (Doc. 35).

Plaintiffs now allege in support of their intentional
interference with contractual relations claims that: (1)

defendant engaged in telephone solicitation of *Post* customers, offering them the *Enquirer* for reduced rates (Am. Compl. ¶ 26); (2) defendant failed to provide plaintiffs with enough copies of the paper for their retail, rack, and home delivery routes (Am. Compl. ¶ 27); and (3) defendant caused advertisements for the *Enquirer* at reduced rates to be placed inside other ads in the *Post* to be delivered by plaintiffs to their customers (Am. Compl. ¶ 28).

In support of their claims for intentional interference with prospective contractual relations, plaintiffs allege that defendant told prospective customers who called the *Post* subscription telephone line that the *Post* was not delivered in their area when, in fact, it was. (Am. Compl. ¶ 25).

On March 26, 2010, defendant filed the present motion for summary judgment, which has been fully briefed. (Doc. 39).

*Analysis*

A.   Summary Judgment Standard

In memorandum opinions such as this, little purpose is typically served by reiterating the standard for summary judgment, with which counsel and reviewing courts are familiar. However, the court finds it appropriate here to revisit several points.

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that

there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must review all the evidence, facts, and inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In order to defeat a summary judgment motion, the nonmoving party "must show sufficient evidence to create a genuine issue of material fact." *Prebilich-Holland v. Gaylord Entm't Co.,* 297 F.3d 438, 442 (6th Cir. 2002). The nonmoving party must present evidence sufficient to permit a reasonable jury to find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

Mere "speculation, conjecture, or fantasy" is insufficient to raise a triable issue. *Lewis v. Phillip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (citation omitted). Further, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Matsushita*, 475 U.S. at 586)).

With these principles in mind, the court concludes that plaintiffs have not met their burden of showing that there is any triable issue of fact on their claims.

**B.    Intentional Interference with Contractual Relations**

To prevail on a claim for the tort of intentional interference with contractual relations, a plaintiff must prove the following elements: (1) the existence of a contract; (2) defendant's knowledge of this contract; (3) that defendant intended to cause its breach; (4) defendant's conduct caused its breach; (5) this breach resulted in damages to plaintiff; and (6) defendant had no privilege or justification to excuse its conduct. *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995).

Intentional interference claims require that the defendant acted with malice or without justification. *ATC Distrib. Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 717 (6th Cir. 2005). *See also Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988) ("[I]t is clear that to prevail [on this claim] a party seeking recovery must show malice or some significantly wrongful conduct."). Simply "attempting to advance one's own legitimate economic interests at the expense of another's interests does not constitute malice." *ATC Distrib. Group*, 402 F.3d at 717 (citation omitted).

**C.    Tortious Interference with Prospective Business Advantage**

"In Kentucky, to recover for tortious interference with a prospective business advantage, [plaintiff] must show (1) the existence of a valid business relationship or its expectancy; (2) [defendant's] knowledge thereof; (3) [defendant's] intentional act of interference; (4) [defendant's] improper motive; (5) causation; and (6) special damages." *Ventas, Inc. v. Health Care Prop. Investors, Inc.*, 635 F. Supp.2d 612, 621 (W.D. Ky. 2009) (citation omitted).

A valid business expectancy exists when there is "a reasonable likelihood or a probability, not mere wishful thinking" that a business relationship will come about. *Id.* (citation omitted).

"Next, the interference must be improper." *Id.* at 622 (citation omitted). "Showing malice or some significantly wrongful conduct is evidence of improper conduct." *Id.* "Under Kentucky law, significantly wrongful conduct certainly includes fraudulent misrepresentation, deceit, coercion, threats of illegal conduct, and physical violence, which are specifically highlighted as improper acts." *Id.* (citation omitted).

**D.   Application of These Principles to Plaintiffs**

The court first notes that, in their responsive memorandum, plaintiffs have cited no record evidence in support of the claims of four of the six plaintiffs: Brenda Andress, Daniel Chase, Clifford Meyers, and Michael Payne.  Nonetheless, the court has an independent obligation to review the record as it pertains to these plaintiffs.

**1.   Brenda Andress**

Plaintiff Brenda Andress ("Andress") purchased three *Post* delivery routes in March 2006, two years after Gannett announced that it would not renew the JOA when it expired in 2007. (Andress Depo. 17)  Before completing this purchase, Andress was informed by the route sellers that it was possible that the *Post* would not be published after the end of 2007.  (*Id.* at 53). Andress entered into a contract with Gannett dated April 1, 2006 for the purchase of *Post* papers for resale.  (Doc. 39-5). Andress's routes included home delivery customers as well as news racks and retail outlets.  Andress owned her routes until the *Post* ceased publication in December 2007.

**Insufficient Copies of Paper**: Andress testified in her deposition that she always had "plenty" of copies of papers for her retail locations.  (Andress Depo. 153-54).  In her interrogatory responses, she stated that, in September 2007, she had shortages in her home deliveries, but she could not identify

any customer whose business she lost as a result.  (Doc. 39-38 at 11).  Moreover, her statement in her interrogatory response that the shortages in home delivery papers required her to put fewer papers in her rack sales contradicts her deposition testimony that she always had sufficient papers for her rack sales. Therefore, Andress raises no triable issue of fact with respect to this allegation.

**Placement of Ads for *Enquirer* in the *Post***:  Andress testified that she was not aware that any advertisements for the *Enquirer* at reduced rates were placed in papers that she distributed.  (Andress Depo. 186).  She thus cannot establish a tortious interference claim based on this allegation.

**Telephone Solicitation of Existing Customers**:  Andress testified that one of her customers named Trula Donohoe was called and offered the *Enquirer* at a reduced rate and that Donohoe reduced her *Post* subscription from seven days to one day as a result.  (Andress Depo. 130-31)  She testified that this happened in November 2007.

As defendant notes, Andress has produced no evidence that defendant knew at the time that it contacted Donohoe that she was a *Post* subscriber.  A party cannot commit the intentional tort of interference with contractual relations unless it knows of the contract in question and intends to cause its breach.  *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995).

*See also Crown Equipment Corp. v. Toyota Material Handling, U.S.A.*, 202 Fed. App'x 108, 111-12 (6th Cir. 2006) (affirming dismissal of interference claim under Ohio law because there was no evidence that defendant knew of specific contract in question; an allegation that the defendant "should have known" is insufficient because it "wrongly imports a negligence standard" into this intentional tort).

Moreover, Andress alleges that this call to Donohoe occurred in mid-November 2007, months after it had been announced that the *Post* would cease publication in December 2007. In view of the imminent discontinuation of the *Post*, no reasonable person could find the *Enquirer*'s solicitation of persons who were not then customers unreasonable or malicious, which is required for this tort. *See National Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988).

**Interference with Prospective Customers**: The only person Andress could identify whom she claims contacted defendant and was told that the *Post* was not available where he lived was a man named McCormick. (Andress Depo. 60). However, this person contacted Andress and she put him on her route. Thus, she cannot show as a matter of law that her prospective contract with this person was actually interfered with or that any damage to her resulted.

Therefore, Andress raises no triable issue on any of her

claims.

### 2. Daniel Chase

Plaintiff Daniel Chase ("Chase") purchased his *Post* route from his wife in 2002. (Chase Depo. 88). The majority of Chase's business was home delivery, although he had two retail locations. (*Id.* at 35). Chase owned his route until the *Post* ceased publication in December 2007.

**Insufficient Copies of Paper**: Chase testified that the allegation in the Complaint regarding defendant providing an insufficient number of papers for retail sale does not apply to him. (Chase Depo. 86). He further testified that, "with rare exception," he received adequate copies for his home delivery customers. (*Id.* at 89). Chase thus cannot base a claim for intentional interference on this allegation.

**Placement of Ads for *Enquirer* in the *Post***: Chase testified in his deposition that, sometime in 2006 or 2007, he and other carriers were required to place in their copies of the Saturday *Post* flyers advertising the *Enquirer* for a reduced rate. (Chase Depo. 96-99). Chase was not sure, but he testified that he thought the advertisement may have been for copies of the Sunday *Enquirer*. (*Id.* at 124).

If the ads were indeed for the Sunday *Enquirer*, then no intentional interference claim would lie based on this allegation because it is undisputed that the *Post* did not publish a Sunday

paper.  In any event, Chase did not identify any customer he lost
as a result of these ads and thus he cannot show any interference
or damages as a matter of law.

**Telephone Solicitation of Existing Customers**:  Chase
testified in his deposition that a customer named Nancy Ebert was
solicited by the *Enquirer.* (Chase Depo. at 28-29).  However,
Ebert avers in an affidavit that she does not remember the
*Enquirer* offering her a deal or asking her to switch from the
*Post*.  (Ebert Aff. ¶¶ 4-5) (Doc. 39-15).  In any event, Chase
later testified that Ebert continued to subscribe to the *Post*
until its ceased publication in December 2007.  (*Id.* at 135-36).
As such, he cannot show any interference with his contract with
this customer.

Chase also named Kenneth Thornton as a customer solicited by
the *Enquirer*.  (Chase Depo. 58).  In an affidavit, Thornton
confirms that he was so solicited, but he declined the offer and
continued to receive the *Post* until it ceased publication.
(Thornton Aff. ¶¶ 5, 10).  As a matter of law, therefore, Chase
cannot show that defendant intentionally interfered with this
contract.

Chase also testified that he believes a customer named
Victor Brown was solicited to receive the *Enquirer* at a reduced
rate.  (Chase Depo. 140-42).  Chase did not apeak to Brown about
this, his wife did.  (*Id.*).  However, Brown avers in an affidavit

that he does not recall the *Enquirer* asking him to switch to the *Post*, and that he kept his *Post* subscription until it went out of business.  (Brown Aff. ¶¶ 4,6) (Doc. 39-18).  As a matter of law, this claim thus fails.

Chase makes similar allegations regarding customers named Jackie Richardson, Donald Boden, Archie Williams, and Paul Popovich.  (Chase Depo. 142-44).  Chase has presented no evidence, however, as to when these alleged calls occurred or, more importantly, that defendant knew of his contracts (which also have not been produced) with these individuals so that any interference could be proven to be intentional.  Moreover, as to the Bodens, defendant has produced evidence that their *Enquirer* subscription was at a full, not discounted, rate.

Moreover, Archie Williams avers in an affidavit that he was never offered the *Enquirer* for free or at a reduced rate; that defendant never asked him to switch to the *Post*; and that he cancelled his *Post* subscription because there was duplication in their content and because of the recession.  (Williams Aff. ¶¶5-6, 9) (Doc. 39-20).

In sum, Chase cannot prove an intentional interference claim based on the allegations of solicitation as a matter of law.

**Interference with Prospective Customers**:  Chase alleges that several people – Nancy Ebert, Leonard Schulte, and Doug Sheanshang – who wanted to subscribe to the *Post* were told that

they could not receive it in their area.  However, Chase testified in his deposition that these people nonetheless contacted him directly, became his customers, and remained such until the *Post* ceased publication.  (Chase Depo. 134-36).  As a matter of law, therefore, Chase has no claim for interference with prospective contractual relations.

### 3.  Clifford Meyers

Plaintiff Clifford Meyers ("Meyers") purchased his *Post* route in 2004.  (Meyers Depo. 10).  Meyers had several retail locations as well as home delivery customers.  (*Id.* at 10, 15-16).  Meyers operated his route until the *Post* ceased publication in December 2007.  (*Id.* at 15).

**Insufficient Copies of Paper**: Meyers testified that this allegation has nothing to do with him and that he did not lose any customers due to paper shortages.  (Meyers Depo. 35, 38).

**Placement of Ads for *Enquirer* in the *Post***:  Meyers testified that he heard about ads for the *Enquirer* being placed in the *Post* but that he never actually saw them and does not believe it ever had an impact on him.  (Meyers Depo. 42-43).

**Telephone Solicitation of Existing Customers**:  Meyers testified that he does not believe that any of his customers were solicited by the *Enquirer*.  (Meyers Depo. 33-34).

**Interference with Prospective Customers**:  Meyers testified that he does not know of anyone who was falsely told by the

*Enquirer* that the *Post* was not available in their area.  (Meyers Depo. 29).

In sum, Meyers has raised no triable issue as to any of his claims.

### 4.  Michael Payne

Plaintiff Michael Payne purchased his *Post* route in 1985. (Payne Depo. 26).  He had both retail locations and home delivery customers.  (*Id.* at 31).  Payne operated his route until the *Post* ceased publication in December 2007.

**Insufficient Copies of Paper**:  Payne testified that he regularly was "shorted" on the number of copies of the *Post* that he received.  (Payne Depo. at 189).  However, Payne has not identified any retail location or home delivery customer who cancelled their contract with him as a result of any shortage. (*Id.* at 201-03).  Consequently, Payne cannot show, as a matter of law, that such shortages (even assuming that they were intentional) caused any contractual breach that damaged him.

**Placement of Ads for *Enquirer* in the *Post***:  Payne testified that he saw ads for the *Enquirer* at reduced rates placed inside his copies of the *Post* in the Fall of 2007.  (Payne Depo. at 207-08).  Nonetheless, he also testified that he knew of no customers of his who cancelled their *Post* subscriptions as a result of the ads.  (*Id.* at 211).  Therefore, no claim for intentional interference can rest on this basis.

**Telephone Solicitation of Existing Customers**: Payne testified that he does not know of any of his customers who were called by the *Enquirer* and solicited to take that paper. (Payne Depo. at 187). This claim thus fails as a matter of law.

**Interference with Prospective Customers**: Finally, Payne testified that he cannot identify any prospective customer who called the *Enquirer* and was told that the *Post* could not be delivered in their area, and no one ever told him that it had happened. (Payne Depo. at 40, 169).

Therefore, Payne has raised no triable issue of fact on any of his claims.

### 5. Thomas Reckers

Plaintiff Thomas Reckers purchased his *Post* route in 1980. (Reckers Depo. 118). He had both retail locations and home delivery customers. (*Id.* at 14). Reckers operated his route until the *Post* ceased publication in December 2007.

**Insufficient Copies of Paper**: Reckers produced no evidence in support of this claim.

**Placement of Ads for *Enquirer* in the *Post***: Reckers testified that from 2004 to 2007 ads were placed in the *Post* for the Sunday *Enquirer* advertising that paper for sale at retail outlets for 99 cents. (Reckers Depo. 86-87). It is undisputed, however, that the *Post* did not publish a Sunday paper, so no reasonable person could find that such ads interfered with any

16

contract between Reckers and his *Post* customers.

**Telephone Solicitation of Existing Customers**: Reckers named thirteen (13) households as customers who were solicited by the *Enquirer*. As to nine (9) of these households, plaintiff has not attempted to refute the absence of material fact identified in defendant's motion. These will thus be dealt with in a summary fashion:

(1) **Elizabeth Marksberry**: Although Reckers alleges that she was offered the *Enquirer* for free for six months, he admits he did not lose her as a customer. (Reckers Depo. 67).

(2) **Joseph and Susan Perny**: Reckers states that the Pernys were offered a six-month special for the *Enquirer* and thus stopped receiving the *Post*. (Reckers Depo. 72). However, defendant produced an affidavit in which Susan Perny states that she does not remember ever being solicited by the *Enquirer* and that they ended their *Post* subscription because they preferred a morning paper. (Perny Aff. ¶¶ 4-6) (Doc. 39-24).

(3) **Robert Ruberg**: Reckers testified that the Rubergs quit the *Post* as a result of solicitation (Reckers Depo. 72), however, defendant produced an affidavit from Mr. Ruberg in which he states that the *Enquirer* never asked them to switch from the *Post* and that they continued to subscribe to the *Post* until December 2007, when it went out of business. (Ruberg Aff. ¶¶ 4, 6) (Doc. 39-25).

(4) **Richard and Jean Vonhandorf**: Reckers alleges that he lost the Vonhandorfs as *Post* customers after they stopped their delivery for a vacation and then never resumed it, and that the *Enquirer* told them that, since the *Post* was closing and they were such good *Post* customers, they could get the *Enquirer* at a special rate. (Doc. 38-21 at 5), (Reckers Depo. 205). However, Reckers's delivery records show that after vacations in 2006, during which they stopped the delivery of the *Post*, the Vonhandorfs resumed their deliveries. (Doc. 39-26). Those records also show

17

that these customers did not discontinue their *Post*
subscription until November 2007, one month before the
paper went out of business.  (Doc. 39-27)  Finally,
defendant has produced evidence that when these
customers did begin subscribing to the daily *Enquirer*,
it was at a regular – not reduced – rate.  (Preisser
Aff. ¶ 5) (Doc. 39-19).

(5) **Nicholas and Deborah Kremer:**  Reckers states that he
lost the Kremers as customers because they got a
special rate on the *Enquirer* and they told him they had
no need for two papers.  (Reckers Depo. 204; Doc. 39-21
at 4).  Defendant has produced an affidavit from
Deborah Kremer, however, in which she states that they
received both the *Post* and the *Enquirer*, that she does
not remember the *Enquirer* ever asking her to switch,
and that they continued to receive the *Post* until it
went out of business in December 2007.  (Kremer Aff. ¶¶
3-7) (Doc. 39-29).

(6) **Dennis and Joan Halfhill:**  Reckers states that he lost
the Halfhill's business because they got a special rate
on the *Enquirer*.  (Reckers Depo. 206; Doc. 39-21 at 6).
However, it is undisputed that the Halfhills had been
subscribing to the *Enquirer* since 2004 at the full (not
discounted) rate, (Preisser Aff. ¶ 7) (Doc. 39-19), and
that they continued their *Post* subscription until at
least October 2006.  (Doc. 39-31).  No claim for
intentional interference thus lies as to the Halfhills.

(7) **Harry and Janice Geimeier:**  Reckers also alleges that
he lost the Geimeiers as customers because they did not
like the new *Post* format and the *Enquirer* offered them
a special rate.  It is undisputed that the Geimeiers
began receiving the *Enquirer* on Sundays only in June
2006.  (Preisser Aff. ¶¶ 8-9).  Further, these
customers cancelled their *Post* subscription in February
2007 and were not offered an upgrade to their *Enquirer*
subscription until September 2007.  (*Id.*).  Reckers
thus cannot show that any offer from the *Enquirer*
caused them to breach their contract with him.

(8) **Robert and Loraine Vonhandorf:**  Reckers states that he
lost the Vonhandorfs as customers because they were
offered a special deal by the *Enquirer*.  (Reckers Depo.
206).  However, the Vonhandorfs had been subscribing to
the *Enquirer* since October 2005 at the full rate, and

they did not discontinue their *Post* subscription until August 2006.  There is this no evidence that any action by defendant caused these customers to breach their contract.

(9)  **Tom and Carol Daria:**  Reckers testified that the Darias were offered the *Enquirer* free for six months, which caused them to cancel their *Post* subscription. (Reckers Depo. 67-68, 202).  Reckers's billing records show that the Darias received the *Post* from him until December 2006.  (39-33).  However, there is no evidence that the *Enquirer* knew of any contract between Reckers and the Darias, a necessary element of this claim.

The remaining four customer contracts with which Reckers alleges defendant unlawfully interfered are those with Marcella Dailey, John and Annie Wilson, Dennis Hirt, and Bill Gerwe.

Reckers states that Marcella Dailey stopped receiving the *Post* and thereafter received the *Enquirer*.  (Doc. 39-21 at 4; Reckers Depo. 204).  However, defendant submitted an affidavit from Dailey in which she states that, although she was solicited by the *Enquirer*, she always "said no" and that she continued to receive the *Post* until it ceased publication.  (Doc. 39-22). Reckers takes issue with this assertion because his billing records show that Dailey stopped her *Post* subscription at the end of July 2007.  (Doc. 44-4 at 1).  However, given Dailey's averment that she never accepted the *Enquirer*'s offers, this discrepancy raises no triable issue of fact.  Moreover, as with other customers, Reckers has produced no evidence that defendant actually knew of any contract between him and Dailey.

Next, Reckers alleges that defendant interfered with his

contract with John and Annie Wilson by offering them the *Enquirer* for free. (Reckers Depo. 68; Doc. 39-21 at 5). Annie Wilson, however, states in an affidavit that she cancelled her subscription to the *Post* only because of a format change. Given that only Wilson could have personal knowledge of her reason for cancelling her *Post* subscription, no triable issue arises.

Reckers also alleges improper interference with his contract with Dennis Hirt whom he says was offered the *Enquirer* at a special rate. (Reckers Depo. 203; Doc. 39-21 at 4). However, Hirt began receiving the *Enquirer* in 2005 at the full rate (Preisser Aff. ¶ 6), and he continued receiving the *Post* through at least July 2007. Reckers has no evidence that Hirt cancelled his *Post* because of any special offer. Moreover, given that Gannett had announced in July 2007 that it would no longer publish the *Post* after December, Reckers could not show that any solicitation lacked justification or that it constituted anything other than the *Enquirer* advancing its own economic interests by trying to pick up *Post* customers given the imminent discontinuation of that paper.

Finally, Reckers claims that defendant interfered with his contract with Bill Gerwe, offering him a special rate and causing him to quit the *Post*. (Reckers Depo. 72-73). Gerwe, however, states in an affidavit that the *Enquirer* never asked him to switch from the *Post* or offered him a discounted rate. (Gerwe

20

Aff. ¶ 4).  While Reckers disputes the date that Gerwe cancelled his *Post* subscription, he has offered no evidence to contradict Gerwe's sworn statement that he was not solicited by the *Enquirer*.

**Interference with Prospective Customers**:  Reckers testified in his deposition that Marlene Vercheak called the *Post* subscription line and was told incorrectly that the paper was not available where she lived.  (Reckers Depo. 48, 50-51). Vercheak's husband, however, states in an affidavit that he and his wife were never told that the *Post* was not delivered in their area.  (Vercheak Aff. ¶ 8).  Moreover, Reckers testified that Mrs. Vercheak contacted him and began receiving the *Post* from him (Reckers Depo. 51), and Reckers continued to deliver the *Post* to them until the paper ceased publication in December 2007.  (*Id.* at 50; Vercheak Aff. ¶ 11).

Reckers also testified that Sharon Blank was told that the *Post* was not delivered in her area (Reckers Depo. 53), but he then testified that Blank became his customer and he did not lose her before the paper ceased publication.  (*Id.* at 202-03). Reckers's billing records also reflect that Blank continued her subscription until December 2007.  (Doc. 39-40).

Therefore, as a matter of law, Reckers cannot show that defendant intentionally interfered with his existing or prospective customers.

### 6. Gregory Butts

Plaintiff Gregory Butts purchased his *Post* route in 1996. (Butts Depo. 8). He had both retail locations and home delivery customers. (*Id.* at 12-13). Butts operated his route until the *Post* ceased publication in December 2007.

**Insufficient Copies of Paper:** Butts testified that he had sufficient copies of the *Post* to deliver to his home delivery customers, although he sometimes had to take copies from his rack locations to fulfill his home deliveries. (Butts Depo. 133-34). Butts produced no evidence, however, that any shortages in the numbers of papers he received was the result of an intentional or malicious act by defendant.

**Placement of Ads for *Enquirer* in the *Post*:** Butts does not recall such advertisements ever being placed in the papers he delivered. (Butts Depo. 98).

**Telephone Solicitation of Existing Customers:** Butts testified in his deposition that the alleged solicitation of *Post* customers by the *Enquirer* "did not happen to me," nor was he aware of any customers who were offered the *Enquirer* for a reduced rate when they called the *Post* subscription line. (Butts Depo. 90).

Butts alleged, however, that he lost customer Diane Brake from time to time because she told him she could get the *Enquirer* for 25 cents at SuperAmerica and get a cup of coffee as a part of

the deal.  (Butts Depo. 114).  In an affidavit, however, Brake states that, while she stopped her *Post* delivery when she went on vacation, she was never asked by the *Enquirer* to switch her subscription and that she continued it until the *Post* went out of business.  (Brake Aff. ¶¶ 4-5, 8).

Finally, Butts testified that customer Thomas Anderson told him that he was offered a good home delivery deal by the *Enquirer* and that he cancelled his *Post* subscription as a result. Anderson originally stated in an affidavit that he could not remember having been solicited by the *Enquirer* and did not cancel his *Post* subscription prior to December 2007 (Doc. 39-13), but he submitted a subsequent affidavit stating that his memory had been incorrect and that he, in fact, had cancelled his *Post* subscription in June 2006.  (Doc. 44-3).  However, Anderson still does not state that this change was the result of any intentional act by the *Enquirer*, nor has Butts produced evidence that the *Enquirer* actually knew of any contract between him and Anderson.

**Interference with Prospective Customers**:  Butts testified in his deposition that the allegation regarding the solicitation of prospective customers does not apply to him.  (Butts Depo. 30).

In sum, even viewing the evidence in plaintiffs' favor, they have raised no triable issue on any of their claims, and summary judgment in defendant's favor is appropriate.

Therefore, having reviewed this matter, and the court being otherwise sufficiently advised,

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. 39) be, and is hereby, **GRANTED**.  A separate judgment shall enter concurrently herewith.

This 30th day of September, 2010.



Signed By:

**William O. Bertelsman**

**United States District Judge**

TIC: 24 min.